FILED
DECEMBER 14, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

07 C 7055

| | |
|---|---|
| AMERICAN MORTGAGE CONSULTANTS INC., an Illinois Corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. ) ) |
| OPUS CAPITAL MARKETS CONSULTANTS, LLC, an Illinois limited liability corporation, VERO SOLUTIONS, INC., an Illinois corporation, JOSEPH ANDREA, an individual, JENNIFER LABUD, an individual, and ANTHONY GUIDICI, an individual, | ) **COMPLAINT FOR COPYRIGHT** ) **INFRINGEMENT** ) ) ) ) ) |
| Defendants. | ) ) ) |

JUDGE HIBBLER
MAGISTRATE JUDGE MASON

## COMPLAINT

Plaintiff American Mortgage Consultants, Inc., by its undersigned attorneys, for its Complaint against Defendants Opus Capital Markets Consultants, LLC, Vero Solutions, Inc., Joseph Andrea, Jennifer LaBud, and Anthony Guidici, states as follows.

### PARTIES TO THIS ACTION

1.  Plaintiff American Mortgage Consultants, Inc. ("AMC") is a corporation organized under the laws of Illinois and having its principal place of business at 325 N. Milwaukee Ave., Suite 201, Libertyville, Illinois 60048.

2.  AMC is a residential mortgage due diligence and consulting firm engaged primarily in the business of evaluating and rating residential mortgages for potential purchase by major investment banking clients.

3. Defendant Joseph Andrea ("Andrea") is an individual who resides at 962 Half Day Road, Highland Park, Illinois 60035. Prior to February 21, 2005, Andrea was President and Secretary/Treasurer of AMC, previously having served as Vice President, and Executive Vice President. Andrea also concurrently was a long-standing employee of AMC.

4. Defendant Jennifer LaBud ("LaBud") is an individual who resides at 401 Inverness Drive, Gurnee, Illinois 60031. Prior to February 21, 2005, LaBud was (consecutively) Vice President and Senior Vice President of Compliance of AMC, previously having served as an officer and long-standing employee of AMC.

5. Defendant Opus Capital Markets, LLC ("Opus") is an limited liability corporation organized under the laws of Illinois, having its principal place of business at 150 North Michigan Avenue, Suite 2800, Chicago, Illinois 60601. Opus also has business offices at 100 Tristate International Building, Suite 140, Lincolnshire, Illinois 60069.

6. Defendant Vero Solutions, Inc. ("Vero"), is an Illinois corporation, and upon information and belief has its principle place of business at 754 Brighton Circle, Port Barrington, Illinois 60010.

7. Vero is a software design, development and training business.

8. Defendant Anthony Guidici ("Guidici"), an individual and President of defendant Vero Solutions, Inc., resides at 754 Brighton Circle, Port Barrington, Illinois 60010.

9. Defendants Andrea, LaBud, and Guidici are citizens and/or residents of the State of Illinois.

10. Defendant Opus is a citizen and/or resident of the State of Illinois.

11. Defendant Vero is a citizen and/or resident of the State of Illinois.

**JURISDICTION AND VENUE**

12. Jurisdiction of this Court is invoked under 28 U.S.C. § 1331 and § 1338(a), as it is an action arising under Acts of Congress relating to copyrights, namely, the Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq.*

13. This District Court has personal jurisdiction over each of the Defendants because they reside and/or do business in this District or engaged in the conduct and/or caused harms at issue in this case in this District.

14. Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2) in that a substantial part of the events or omissions giving rise to this action occurred in this District.

**HISTORY AND BUSINESS OF PLAINTIFF AMC**

15. AMC was founded in 1996 by David Leahy. Mr. Leahy is still with AMC, in the position of Chief Executive Officer.

16. Although located in Lake County, Illinois, AMC's business is not limited to the Chicago area or the Midwest. Instead, it spans the entire United States. AMC, by and through the use of its computers, programs, software and other digital media, is involved in interstate commerce.

17. In the specialized industry of evaluating and rating residential mortgages, there are only five or six other firms in the United States who are considered "significant competitors" with AMC in the business of evaluating and rating residential mortgages for potential purchase by major investment banking institutions.

18. The following example assists in understanding AMC's primary business: Investment Banking Institution A is interested in purchasing a portfolio of 1000 residential loans from Loan Originator B. Before purchasing the portfolio, however, Investment Banking Institution A must ensure that the loans to be purchased are in compliance with all

3

applicable Federal, State, County, and City laws and regulations and that the borrowers have the ability to pay and the willingness to pay, and that collateral supports the transactions. Otherwise, Investment Banking Institution A is left potentially exposed to legal and credit issues and ownership of unsound notes. Investment Banking Institution A hires AMC to review the portfolio of loans (or a client specified cross-section thereof) and evaluate the loans for their propriety and soundness. This is essentially a "due diligence" process which focuses heavily on compliance and anti-predatory lending. Based on AMC's recommendation, Investment Banking Institution A decides which loans to purchase and put in a portfolio.

19.     The business of evaluating and rating residential mortgages for potential purchase by major investment banking institutions involves in depth review and analysis of mortgage closing and credit files, and producing recommendations based on the results of that review and analysis.

## AMC'S "TIGRE I" SYSTEM

20.     To accomplish its evaluation of the purchase worthiness of loans for lenders, AMC engages in a complex, multi-faceted review process of loan documents.

21.     To facilitate the accuracy, thoroughness, and speed of its review of loan documents, starting in or around 2001, AMC began developing a computer software system known as the "TIGRE" system and known colloquially within AMC as "TIGRE I".

22.     The TIGRE I system allowed AMC's underwriters and executives to detect non-compliance issues with Federal, State, County, and City lending regulations contained in loan documents much more thoroughly and quickly than without the TIGRE I system.

23.     On December 8, 2003, AMC was granted a copyright registration for TIGRE I, U.S. Copyright Registration No. TXU-1-169-737.

24. AMC owns all right, title and interest in and to TIGRE I, including without limitation all copyright rights.

## AMC'S "TIGRE WEB-ENABLED" SYSTEM

25. Subsequent to the completion of TIGRE I, AMC began developing an updated computer-based software system to evaluate and rate residential mortgages for potential purchase by major investment banking institutions, which ultimately became colloquially known as "TIGRE Web-Enabled" (a/k/a "TIGRE II" within AMC, or "Loan Review and Mortgage Compliance System," or "LRMCS" by Defendants).

26. TIGRE Web-Enabled, which was based on and derived from and incorporated pre-existing material from TIGRE I, improved on TIGRE I by allowing AMC's underwriters and executives to even more thoroughly and accurately evaluate subject loan documents, particularly in the compliance, credit and reporting areas.

27. TIGRE Web-Enabled also allowed AMC to develop additional and improved customized reports for its various clients, each of which has somewhat varying reporting requirements.

28. In most superficial part, the TIGRE Web-Enabled system consists of a series of web enabled data entry screens which underwriters use to enter loan data in a centralized database.

29. Data entry by underwriters automatically triggers a "validation" process in which the data is checked and cross-checked against other entered data, applicable governmental regulations, and other information before the loan has completed the underwriting cycle.

30. AMC updates the TIGRE Web-Enabled credit and compliance engine regularly, using a proprietary "mapping" document. These updates include Federal, State, County, and City regulatory information from across the country.

31. The TIGRE Web-Enabled system then automatically uses this regulation information to ascertain whether a given loan and loan documents being analyzed are properly in compliance with applicable governmental regulations.

32. If data entered conflicts with other data, applicable governmental regulations, or other information known to TIGRE Web-Enabled (in other words, if the loan does not "comply" with the applicable regulations), the validation process of TIGRE Web-Enabled alerts the user of the conflict or problem.

33. The specifications for the compliance engine and the validation engine and the validation inquiries included in TIGRE Web-Enabled by AMC were created by the employees of AMC, based on AMC internal visions, which does not mimic any system outside of AMC, and which are not known outside of AMC.

34. Peter Kempf, former Vice President and current President of AMC, and Mary Wachenheim, head of Information Technology for AMC, wrote the specifications for the validations included in the TIGRE Web-Enabled system.

35. AMC's validation inquiries and specifications in the TIGRE Web-Enabled system are of great value to AMC's business as well as they would be to its competitors, in that AMC's validation and compliance engine inquiries and specifications would allow the competitors to evaluate the purchase worthiness of loans more thoroughly and accurately than they currently are able to do and would have access to confidential client specific reporting information.

36. The value to AMC of TIGRE Web-Enabled's validation engine and compliance engine specifications is that the TIGRE Web-Enabled system gives AMC a competitive advantage over its competition as the results are more accurate and the system is easier to use which allows for increased efficiencies.

37. Upon information and belief, AMC's validation engine and compliance specifications are unique to its industry in that none of AMC's competitors have a system as thorough or accurate as TIGRE Web-Enabled or containing the same specifications.

38. The validation engine and compliance engine of TIGRE Web-Enabled have been an important part of AMC overall relationships and goodwill with its clients and have been a significant income and profit source to AMC, in that AMC's clients depend on the thoroughness and accuracy of reports AMC is able to achieve in analyzing loans using the validation engine and compliance engine of TIGRE Web-Enabled.

39. AMC has relied upon and utilized the web enablement, validation engine, compliance engine, and reports of TIGRE Web-Enabled in its business, which was created by AMC for internal use at significant expense and considerable time and effort. Such information has been of significant importance to AMC in the business of evaluating and rating residential mortgages for potential purchase by major investment banking institutions.

**DEVELOPMENT OF AMC'S TIGRE WEB-ENABLED SYSTEM**

40. In an effort to expedite completion and implementation of TIGRE Web-Enabled, AMC sought the services of and, on or about June 18, 2003, entered into an agreement with, Defendants Guidici and Vero to reverse-engineer the database structure of and migrate the pre-existing TIGRE I application from one database platform to another, and to enable remote access to the application, to be known as TIGRE Web-Enabled.

41. Upon information and belief, before working on the TIGRE Web-Enabled project for AMC neither Guidici or Vero had any prior experience with residential mortgage due diligence and compliance software nor had Guidici or Vero performed services for any business similar to AMC, namely, residential mortgage due diligence and compliance consulting firms engaged primarily in the business of evaluating and rating residential mortgages for potential purchase by major investment banking clients.

42. Guidici and Vero were allowed access to the specifications for the validation engine and the program source code for the sole purpose of developing TIGRE Web-Enabled and with the understanding and agreement that the specifications would be held in the strictest confidence by Guidici and Vero, and not used for any purpose other than development of TIGRE Web-Enabled or disclosed to any third party.

43. On or about December 14, 2004, Defendant Vero was granted a copyright registration for TIGRE Web-Enabled (described as "LRMCS" in the Registration documents), U.S. Copyright Registration No. TX 6-083-227. A copy of Registration No. TX-6-083-227 is attached hereto as Exhibit A.

44. On or about January 20, 2005, AMC terminated its relationship with Guidici and Vero, and withdrew any and all authorization they might have had to access and/or use AMC's computers, software, and source code stating: "Vero personnel, associates and independent contractors are prohibited from accessing any offices, servers and software owned and leased by AMC. Failure to comply will result in prosecution."

45. On February 8, 2007, in litigation pending between these same parties, the Circuit Court of Lake County, Illinois ordered that Defendants Guidici and Vero had agreed to assign and had indeed assigned to AMC, *inter alia*, all copyright and other rights, title and interest in and to TIGRE Web-Enabled, pursuant to a June 2003 agreement between AMC on

one hand, and Guidici and Vero on the other. A copy of the Circuit Court's February 8, 2007 Order is attached hereto as Exhibit B.

46. Thus, by operation of both the circuit court's order and the parties' June 2003 agreement, AMC owns and always has owned, without limitation, all right, title and interest in and to TIGRE Web-Enabled, U.S. Copyright Registration No. TX 6-083-227.

47. On December 10, 2007, AMC also registered TIGRE Web-Enabled in accordance with the Copyright Act by submitting the appropriate and sufficient deposit materials, an application for copyright registration, and all other required materials with the Register of Copyrights. (See Application, attached hereto as Exhibit C; see also U.S. Postal Service Delivery Confirmation Receipt and tracking document referring to the deposit materials and application for copyright registration delivered by AMC, attached hereto as Exhibit D).

## DEFENDANT ANDREA

48. As of February 22, 2005, Defendant Andrea had been an employee of AMC since 1998, and thereafter had become at different times Secretary/Treasurer, Vice-President, Executive Vice-President, and President of AMC.

49. On February 22, 2005, without prior notice to AMC, Andrea announced his intention to resign from AMC unless AMC met certain unreasonable demands. AMC accepted Andrea's resignation on or about the same day.

50. Andrea was involved in the development and implementation of the TIGRE Web-Enabled system as a part of his employment and other relationships with AMC, and has had access to the above-mentioned user roles, web enablement, validation engine, compliance engine and reports, including the specifications, and other trade secrets and confidential information belonging to AMC.

**DEFENDANT LABUD**

51. As of February 22, 2005, Defendant LaBud had been a non-continuous employee of AMC since 1999, and thereafter had become at different times "senior lead", Vice-President of Compliance, and Senior Vice-President of Compliance of AMC. LaBud had been a full-time employee with AMC as of approximately 2003.

52. On February 22, 2005, without prior notice to AMC, LaBud resigned from AMC.

53. LaBud was as a key individual intimately involved in the development of the compliance engine, validation engine, and validation inquiries and specifications of AMC's proprietary system, TIGRE Web-Enabled.

54. During her approximately six years with AMC, LaBud participated extensively in the management and operations of the business affairs of AMC, and on behalf of AMC has been permitted to deal with the potential client list of AMC and the TIGRE Web-Enabled system as a part of her employment and other relationships with AMC, and has had access to the above-mentioned validation system and other trade secrets and confidential information belonging to AMC.

**ANDREA AND LABUD FORM DEFENDANT OPUS**

55. Upon information and belief, immediately after their resignations from AMC, on or about February 23, 2005, Andrea and LaBud incorporated Defendant Opus, with the intent that it would compete directly with AMC for business in residential mortgage due diligence and consulting, especially for that of AMC's established client base of loan sellers and Investment Banking institutions.

**DEFENDANTS VERO AND GUIDICI LICENSE
TIGRE WEB-ENABLED TO DEFENDANT OPUS**

56. On or about February 20, 2005, despite AMC being the rightful owner of all right, title and interest in and to TIGRE Web-Enabled, U.S. Copyright Registration No. TX 6-083-227, Defendants Vero and Opus executed a licensing agreement for Opus' non-exclusive use of TIGRE Web-Enabled, as well as a professional services agreement pursuant to which Vero developed a software system substantially similar to, and derived from, TIGRE Web-Enabled entitled "OpusFirst."

57. All Defendants subsequently acted on the licensing and professional services agreements described above, in that Opus, Andrea, and LaBud used and continue to use TIGRE Web-Enabled in the conduct of Opus' business and Guidici and Vero developed OpusFirst, which Opus, Andrea, and LaBud subsequently used and continue to use in the conduct of Opus' business.

58. The acts described in ¶¶ 56-57 above were committed without implied or express authority, nor with AMC's express or implied permission.

59. AMC did not grant any of the Defendants any right to copy, exhibit, transmit, display, or use in any way TIGRE Web-Enabled or its source code.

60. AMC did not grant any of the Defendants any right to develop or use any derivative of TIGRE Web-Enabled.

## COUNT I
(Copyright Infringement)

61. AMC repeats and realleges ¶¶ 1-60 above as this ¶ 61, as though fully set forth herein.

11

62. The Defendants willfully infringed AMC's copyright in TIGRE Web-Enabled by copying and using TIGRE Web-Enabled and its source code, without permission express or implied from AMC.

63. At the time Vero and Guidici licensed TIGRE Web-Enabled to Opus, all Defendants knew that AMC was the rightful owner of all right, title and interest in and to TIGRE Web-Enabled, U.S. Copyright Registration No. TX 6-083-227, and had not granted any of the Defendants any right to make use of or employ TIGRE Web-Enabled.

64. With full knowledge of AMC's rights herein, the Defendants willfully infringed and continue to infringe AMC's copyrights by copying, using, and employing TIGRE Web-Enabled and its source code. Such was done by the Defendants without the consent, approval, and/or license of AMC.

65. Defendants' acts as aforesaid violate AMC's exclusive rights under § 106 of the Copyright Act of 1976, 17 U.S.C. § 106, as amended, and constitute infringement of AMC's copyright in TIGRE Web-Enabled. Defendants' past and continuing copying and use of TIGRE Web-Enabled and its source code constitute willful and deliberate infringement of AMC's copyrights and are causing irreparable harm and damage to AMC.

### COUNT II
(Copyright Infringement – Derivative Work)

66. AMC repeats and realleges ¶¶ 1-66 as this ¶ 67, as though fully set forth herein.

67. OpusFirst is not an independently created work.

68. Guidici and Vero based OpusFirst on TIGRE Web-Enabled's source code and referred to TIGRE Web-Enabled and its source code while developing OpusFirst.

69. OpusFirst shares substantial similarity with TIGRE Web-Enabled.

70. At the time Vero and Guidici licensed TIGRE Web-Enabled to Opus, all Defendants knew that AMC was the rightful owner of all right, title and interest in and to TIGRE Web-Enabled, U.S. Copyright Registration No. TX 6-083-227, and had not granted any of the Defendants any right to create and use works derivative of TIGRE Web-Enabled.

71. The Defendants willfully infringed and continue to willfully infringe AMC's copyright in TIGRE Web-Enabled by creating and using OpusFirst, a work derivative of TIGRE Web-Enabled.

72. With full knowledge of AMC's rights herein, the Defendants willfully infringed and continue to willfully infringe AMC's copyrights by creating and using OpusFirst, a work derivative of TIGRE Web-Enabled. Such was done by the Defendants without the consent, approval, and/or license of AMC.

WHEREFORE, Plaintiff American Mortgage Consultants, Inc., prays the Court grant it the following relief:

(a) Enjoin the Defendants, their directors, officers, agents, servants, subsidiaries, and affiliates during the pendency of this action and permanently thereafter from infringing the copyrights of AMC in any manner, and from copying and using TIGRE Web-Enabled or any derivative thereof, including but not limited to OpusFirst;

(b) Order Defendants to pay to AMC such actual or statutory damages as it has sustained as a result of Defendants' copyright infringement pursuant to 17 U.S.C. § 504;

(c) Order Defendants to account for and disgorge to AMC all gains, profits, and advantages derived from its copyright infringement pursuant to 17 U.S.C. § 504(c)(2);

(d) Enter judgment against the Defendants finding that their unlawful copying and using of AMC's copyrights is willful;

(e) Enter judgment against the Defendants finding that their unlawful creation, use, and continued use of OpusFirst, a work derivative of AMC's copyrights is willful;

(f) Order Defendants to pay to AMC the costs of this action, along with reasonable attorneys' fees pursuant to 17 U.S.C. § 505; and

(g) Grant AMC other and additional relief as the Court deems appropriate and just.

## JURY DEMAND

Plaintiff American Mortgage Consultants, Inc. hereby demands trial by jury.


Dated: December 14, 2007              By:    /s/      Anthony S. Hind

                                             Thomas J. Ramsdell (6209798)
                                             Anthony S. Hind (6257797)
                                             Carl E. Myers (6270329)
                                             THOMAS J. RAMSDELL & ASSOCIATES
                                             One East Wacker Drive
                                             Suite 2020
                                             Chicago, Illinois 60601
                                             Tel:    312.267.0071
                                             Fax:    866.220.7644

                                             *Counsel for Plaintiff American Mortgage Consultants, Inc.*