## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN MORTGAGE CONSULTANTS, INC., an Illinois Corporation, | ) ) ) | |
| | ) | 07 C 7055 |
| Plaintiff | ) ) | |
| v. | ) ) | **Hon. William J. Hibbler** |
| OPUS CAPITAL MARKETS CONSULTANTS, LLC, VERO SOLUTIONS, INC., JOSEPH ANDREA JENNIFER LABUD AND ANTHONY GUIDICI. | ) ) ) ) ) ) | Magistrate Michael T. Mason |
| Defendants. | ) | |

### DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES

NOW COME the Defendants, Opus Capital Markets Consultants, LLC ("Opus"), Vero Solutions, Inc. ("Vero"), Joseph C. Andrea ("Mr. Andrea"), Jennifer LaBud ("Ms. LaBud"), and Anthony Guidici ("Mr. Guidici") (collectively, "Defendants"), by and through their attorneys, Joseph L. Kish and Trisha M. Cole, and for their Answer and Affirmative Defenses state as follows:

### PARTIES TO THIS ACTION

1.     Plaintiff American Mortgage Consultants, Inc. ("AMC") is a corporation organized under the laws of Illinois and having its principal place of business at 325 N. Milwaukee Ave., Suite 201, Libertyville, Illinois 60048.

**ANSWER:**     Admit.

2.      AMC is a residential mortgage due diligence and consulting firm engaged primarily in the business of evaluating and rating residential mortgages for potential purchase by major investment banking clients.

**ANSWER:**    Admit.

3.      Defendant Joseph Andrea ("Andrea") is an individual who resides at 962 Half Day Road, Highland Park, Illinois 60035. Prior to February 21, 2005, Andrea was President and Secretary/Treasurer of AMC, previously having served as Vice President, and Executive Vice President. Andrea also concurrently was a long-standing employee of AMC.

**ANSWER:**    Defendants deny that Andrea's address is 962 Half Day Road, Highland Park, Illinois 60035; Andrea's current address is 1920 Browning, Highland Park, Illinois 60035. Defendants admit the remaining allegations in paragraph 3.

4.      Defendant Jennifer LaBud ("LaBud") is an individual who resides at 401 Inverness Drive, Gurnee, Illinois 60031. Prior to February 21, 2005, LaBud was (consecutively) Vice President and Senior Vice President of Compliance of AMC, previously having served as an officer and long-standing employee of AMC.

**ANSWER:**    Defendants deny that Ms. LaBud was ever formally appointed as an officer of AMC.  Defendants admit the remaining allegations contained in Paragraph 4.

5.      Defendant Opus Capital Markets, LLC ("Opus") is a limited liability corporation organized under the laws of Illinois, having its principal place of business at 150 North Michigan Avenue, Suite 2800, Chicago, Illinois 60601. Opus also has business offices at 100 Tristate International Building, Suite 140, Lincolnshire, Illinois 60069.

**ANSWER:**    Defendants deny that Opus is a limited liability corporation and affirmatively state that Opus is an Illinois limited liability company.  Defendants deny that Opus'

principal place of business is at 150 N. Michigan Avenue, Suite 2800, Chicago, Illinois 60601; Opus' current principal place of business is located at 100 Tristate International Building, Suite 140, Lincolnshire, Illinois 60069. Defendants further clarify that Opus' correct company name is Opus Capital Markets Consultants, LLC

6.    Defendant Vero Solutions, Inc. ("Vero"), is an Illinois corporation, and upon information and belief has its principle place of business at 754 Brighton Circle, Port Barrington, Illinois 60010.

**ANSWER:**    Admit.

7.    Vero is a software design, development and training business.

**ANSWER:**    Admit.

8.    Defendant Anthony Guidici ("Guidici"), an individual and President of defendant Vero Solutions, Inc., resides at 754 Brighton Circle, Port Barrington, Illinois 60010.

**ANSWER:**    Admit.

9.    Defendants Andrea, LaBud, and Guidici are citizens and/or residents of the State of Illinois.

**ANSWER:**    Admit.

10.    Defendant Opus is a citizen and/or resident of the State of Illinois.

**ANSWER:**    Defendants admit that Opus is a limited liability company organized under the laws of the State of Illinois. Defendants further admit that Opus' principal place of business is located in the State of Illinois.

11.    Defendant Vero is a citizen and/or resident of the State of Illinois.

**ANSWER:**    Defendants admit that Vero is an entity incorporated in the State of Illinois.  Defendants further admit that Vero's principal place of business is located in the State of Illinois.

## JURISDICTION AND VENUE

12.    Jurisdiction of this Court is invoked under 28 U.S.C. § 1331 and § 1338(a), as it is an action arising under Acts of Congress relating to copyrights, namely, the Copyright Act of 1976, as amended, 17 U.S.C. § 101 et seq.

**ANSWER:**    Admit

13.    This District Court has personal jurisdiction over each of the Defendants because they reside and/or do business in this District or engaged in the conduct and/or caused harms at issue in this case in this District.

**ANSWER:**    Admit

14.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2) in that a substantial part of the events or omissions giving rise to this action occurred in this District.

**ANSWER:**    Admit

## HISTORY AND BUSINESS OF PLAINTIFF AMC

15.    AMC was founded in 1996 by David Leahy. Mr. Leahy is still with AMC, in the position of Chief Executive Officer.

**ANSWER:**    Admit

16.    Although located in Lake County, Illinois, AMC's business is not limited to the Chicago area or the Midwest.  Instead, it spans the entire United States.  AMC, by and through the use of its computers, programs, software and other digital media, is involved in interstate commerce.

**ANSWER:** Defendants admit that AMC's business is not limited to the Chicago area or the Midwest. Defendants lack sufficient knowledge to affirm or deny the remaining allegations in paragraph 16.

17. In the specialized industry of evaluating and rating residential mortgages, there are only five or six other firms in the United States who are considered "significant competitors" with AMC in the business of evaluating and rating residential mortgages for potential purchase by major investment banking institutions.

**ANSWER:** Defendants admit that the due diligence business is a specialized industry. Defendants deny that there are only five or six firms in the United States who are AMC's significant competitors, and affirmatively state that there are over fifteen companies that fall into this category. Defendants deny the remaining allegations contained in Paragraph 17.

18. The following example assists in understanding AMC's primary business: Investment Banking Institution A is interested in purchasing a portfolio of 1000 residential loans from Loan Originator B. Before purchasing the portfolio, however, Investment Banking Institution A must ensure that the loans to be purchased are in compliance with all applicable Federal, State, County, and City laws and regulations and that the borrowers have the ability to pay and the willingness to pay, and that collateral supports the transactions. Otherwise, Investment Banking Institution A is left potentially exposed to legal and credit issues and ownership of unsound notes. Investment Banking Institution A hires AMC to review the portfolio of loans (or a client specified cross-section thereof) and evaluate the loans for their propriety and soundness. This is essentially a "due diligence" process which focuses heavily on compliance and anti-predatory lending. Based on AMC's recommendation, Investment Banking Institution A decides which loans to purchase and put in a portfolio.

**ANSWER:**     Paragraph 18 contains no allegations and therefore needs no answer.  To the extent that Paragraph 18 is found to contain any allegations, Defendants deny the same.

19.     The business of evaluating and rating residential mortgages for potential purchase by major investment banking institutions involves in depth review and analysis of mortgage closing and credit files, and producing recommendations based on the results of that review and analysis.

**ANSWER:**     Admit.

## AMC'S "TIGRE I" SYSTEM

20.     To accomplish its evaluation of the purchase worthiness of loans for lenders, AMC engages in a complex, multi-faceted review process of loan documents.

**ANSWER:**     Defendants deny that the review process is complex.  Defendants admit the remaining allegations in paragraph 20.

21.     To facilitate the accuracy, thoroughness, and speed of its review of loan documents, starting in or around 2001, AMC began developing a computer software system known as the "TIGRE" system and known colloquially within AMC as "TIGRE I".

**ANSWER:**     Defendants deny that AMC began developing TIGRE in 2001 and affirmatively state that development for TIGRE began in 2002.  Defendants deny that the term "TIGRE I" was used at AMC before Defendants departure.  Defendants have insufficient information to admit or deny the remaining allegations contained in paragraph 21 and on that basis deny the same.

22.     The TIGRE I system allowed AMC's underwriters and executives to detect non-compliance issues with Federal, State, County, and City lending regulations contained in loan documents much more thoroughly and quickly than without the TIGRE I system.

**ANSWER:**    Defendants deny that TIGRE I allowed underwriters to detect non-compliance issues with state, county or Municipal lending regulations and affirmatively state that TIGRE I could only detect federal regulatory issues.  Defendants admit the remaining allegations contained in paragraph 22.

23.    On December 8, 2003, AMC was granted a copyright registration for TIGRE I, U.S. Copyright Registration No. TXU-1-769-737.

**ANSWER:**    Defendants have insufficient information to either admit or deny the allegations contained in paragraph 23 and on that basis deny the same.

24.    AMC owns all right, title and interest in and to TIGRE I, including without limitation all copyright rights.

**ANSWER:**    Defendants have insufficient information to either admit or deny the allegations contained in paragraph 23 and on that basis deny the same.

### AMC'S "TIGRE WEB-ENABLED" SYSTEM

25.    Subsequent to the completion of TIGRE I, AMC began developing an updated computer-based software system to evaluate and rate residential mortgages for potential purchase by major investment banking institutions, which ultimately became colloquially known as "TIGRE Web-Enabled" (a/k/a "TIGRE II" within AMC, or "Loan Review and Mortgage Compliance System," or "LRMCS" by Defendants).

**ANSWER:**    Deny.

26.    TIGRE Web-Enabled, which was based on and derived from and incorporated pre-existing material from TIGRE I, improved on TIGRE I by allowing AMC's underwriters and executives to even more thoroughly and accurately evaluate subject loan documents, particularly in the compliance, credit and reporting areas.

**ANSWER:** Defendants deny that TIGRE Web-Enabled was based on and derived from and incorporated pre-existing material from TIGRE I. Defendants admit the remaining allegations in paragraph 26.

27. TIGRE Web-Enabled also allowed AMC to develop additional and improved customized reports for its various clients, each of which has somewhat varying reporting requirements.

**ANSWER:** Defendants deny that TIGRE Web-Enabled allowed AMC to produce customized reports and affirmatively state that Crystal Reports software from Business Objects and SQL Server Reporting Services by Microsoft gave AMC that capacity.

28. In most superficial part, the TIGRE Web-Enabled system consists of a series of web enabled data entry screens which underwriters use to enter loan data in a centralized database.

**ANSWER:** Admit.

29. Data entry by underwriters automatically triggers a "validation" process in which the data is checked and cross-checked against other entered data, applicable governmental regulations, and other information before the loan has completed the underwriting cycle.

**ANSWER:** Admit.

30. AMC updates the TIGRE Web-Enabled credit and compliance engine regularly, using a proprietary "mapping" document. These updates include Federal, State, County, and City regulatory information from across the country.

**ANSWER:** Defendants deny that any information in the "mapping" document was proprietary information, and affirmatively state that all the information contained in the "mapping" document was readily available to the public and/or to other members of the

compliance community through research. Defendants admit the remaining allegations contained in paragraph 30.

31.    The TIGRE Web-Enabled system then automatically uses this regulation information to ascertain whether a given loan and loan documents being analyzed are properly in compliance with applicable governmental regulations.

**ANSWER:**    Defendants deny this allegation on the basis that the TIGRE system was behind in compliance regulations at the time of the Defendants' departure from AMC. Defendants lack sufficient information to admit or deny the remaining allegations in paragraph 31 and on that basis, deny the same.

32.    If data entered conflicts with other data, applicable governmental regulations, or other information known to TIGRE Web-Enabled (in other words, if the loan does not "comply" with the applicable regulations), the validation process of TIGRE Web-Enabled alerts the user of the conflict or problem.

**ANSWER:**    Admit.

33.    The specifications for the compliance engine and the validation engine and the validation inquiries included in TIGRE Web-Enabled by AMC were created by the employees of AMC, based on AMC internal visions, which does not mimic any system outside of AMC, and which are not known outside of AMC.

**ANSWER:**    Deny.

34.    Peter Kempf, former Vice President and current President of AMC, and Mary Wachenheim, head of Information Technology for AMC, wrote the specifications for the validations included in the TIGRE Web-Enabled system.

**ANSWER:**    Deny.

35.     AMC's validation inquiries and specifications in the TIGRE Web-Enabled system are of great value to AMC's business as well as they would be to its competitors, in that AMC's validation and compliance engine inquiries and specifications would allow the competitors to evaluate the purchase worthiness of loans more thoroughly and accurately than they currently are able to do and would have access to confidential client specific reporting information.

**ANSWER:**   Defendants deny that TIGRE Web-Enabled is unique in the industry or superior to software used by other companies in the industry.  Defendants deny the remaining allegations contained in paragraph 35.

36.     The value to AMC of TIGRE Web-Enabled's validation engine and compliance engine specifications is that the TIGRE Web-Enabled system gives AMC a competitive advantage over its competition as the results are more accurate and the system is easier to use which allows for increased efficiencies.

**ANSWER:**   Deny.

37.     Upon information and belief, AMC's validation engine and compliance specifications are unique to its industry in that none of AMC's competitors have a system as thorough or accurate as TIGRE Web-Enabled or containing the same specifications.

**ANSWER:**   Deny.

38.     The validation engine and compliance engine of TIGRE Web-Enabled have been an important part of AMC overall relationships and goodwill with its clients and have been a significant income and profit source to AMC, in that AMC's clients depend on the thoroughness and accuracy of reports AMC is able to achieve in analyzing loans using the validation engine and compliance engine of TIGRE Web-Enabled.

**ANSWER:** Defendants admit that AMC's clients, and all investment banking clients, depend on thoroughness and accuracy of due diligence and compliance reports. Defendants deny the remaining allegations contained in Paragraph 38.

39. AMC has relied upon and utilized the web enablement, validation engine, compliance engine, and reports of TIGRE Web-Enabled in its business, which was created by AMC for internal use at significant expense and considerable time and effort. Such information has been of significant importance to AMC in the business of evaluating and rating residential mortgages for potential purchase by major investment banking institutions.

**ANSWER:** Defendants have insufficient information to either admit or deny the allegations contained in paragraph 39 and on that basis deny the same.

## DEVELOPMENT OF AMC'S TIGRE WEB-ENABLED SYSTEM

40. In an effort to expedite completion and implementation of TIGRE Web Enabled, AMC sought the services of and, on or about June 18, 2003, entered into an agreement with, Defendants Guidici and Vero to reverse-engineer the database structure of and migrate the pre-existing TIGRE I application from one database platform to another, and to enable remote access to the application, to be known as TIGRE Web-Enabled.

**ANSWER:** Deny.

41. Upon information and belief, before working on the TIGRE Web-Enabled project for AMC neither Guidici or Vero had any prior experience with residential mortgage due diligence and compliance software nor had Guidici or Vero performed services for any business similar to AMC, namely, residential mortgage due diligence and compliance consulting firms engaged primarily in the business of evaluating and rating residential mortgages for potential purchase by major investment banking clients.

**ANSWER:**     Guidici and Vero admit that while they did not have the specific prior experience with residential mortgage due diligence and compliance software, AMC hired Guidici and Vero specifically because of their prior experience in the financial industry and with major investment banking clients.

42.     Guidici and Vero were allowed access to the specifications for the validation engine and the program source code for the sole purpose of developing TIGRE Web-Enabled and with the understanding and agreement that the specifications would beheld in the strictest confidence by Guidici and Vero, and not used for any purpose other than development of TIGRE Web-Enabled or disclosed to any third party.

**ANSWER:**     Deny.

43.     On or about December 14, 2004, Defendant Vero was granted a copyright registration for TIGRE Web-Enabled (described as "LRMCS" in the Registration documents), U.S. Copyright Registration No. TX 6-083-227.  A copy of Registration No. TX-6-083-227 is attached hereto as Exhibit A.

**ANSWER:**     Deny.

44.     On or about January 20, 2005, AMC terminated its relationship with Guidici and Vero, and withdrew any and all authorization they might have had to access and/or use AMC's computers, software, and source code stating: "Vero personnel, associates and independent contractors are prohibited from accessing any offices, servers and software owned and leased by AMC.  Failure to comply will result in prosecution."

**ANSWER:**     Deny.

45.     On February 8, 2007, in litigation pending between these same parties, the Circuit Court of Lake County, Illinois ordered that Defendants Guidici and Vero had agreed to assign

and had indeed assigned to AMC, inter alia, all copyright and other rights, title and interest in and to TIGRE Web-Enabled, pursuant to a June 2003 agreement between AMC on one hand, and Guidici and Vero on the other. A copy of the Circuit Court's February 8, 2007 Order is attached hereto as Exhibit B.

**ANSWER:**    Admit.

46.    Thus, by operation of both the circuit court's order and the parties' June 2003 agreement, AMC owns and always has owned, without limitation, all right, title and interest in and to TIGRE Web-Enabled, U.S. Copyright Registration No. TX 6-083-227.

**ANSWER:**    Defendants affirmatively assert that the circuit court's February 8, 2007 order is interlocutory.  Further Defendants affirmatively assert that on March 1, 2007 the Circuit Court of Lake County, Illinois ordered a stay on the enforcement of the February 8, 2007 order.

47.    On December 10, 2007, AMC also registered TIGRE Web-Enabled in accordance with the Copyright Act by submitting the appropriate and sufficient deposit materials, an application for copyright registration, and all other required materials with the Register of Copyrights. (See Application, attached hereto as Exhibit C; see also U.S. Postal Service Delivery Confirmation Receipt and tracking document referring to the deposit materials and application for copyright registration delivered by AMC, attached hereto as Exhibit D).

**ANSWER:**    Defendants lack sufficient information to admit or deny the allegations contained in paragraph 47 and on that basis deny the same.

## DEFENDANT ANDREA

48.    As of February 22, 2005, Defendant Andrea had been an employee of AMC since 1998, and thereafter had become at different times Secretary/Treasurer, Vice-President, Executive Vice-President, and President of AMC.

**ANSWER:**    Admit.

48.    On February 22, 2005, without prior notice to AMC, Andrea announced his intention to resign from AMC unless AMC met certain unreasonable demands. AMC accepted Andrea's resignation on or about the same day.

**ANSWER:**    Defendants deny that Mr. Andrea's resignation was without prior warning or notice to AMC.   Defendants deny that Mr. Andrea's proposal to remain at AMC was unreasonable.  Defendants admit the remaining allegations contained in Paragraph 48.

49.    Andrea was involved in the development and implementation of the TIGRE Web-Enabled system as a part of his employment and other relationships with AMC, and has had access to the above-mentioned user roles, web enablement, validation engine, compliance engine and reports, including the specifications, and other trade secrets and confidential information belonging to AMC.

**ANSWER:**    Defendants admit that Mr. Andrea sat in on meetings where "TIGRE II" was discussed and that he had access to "TIGRE II" and its elements.  Defendants deny the remaining allegations contained in Paragraph 49.

## DEFENDANT LABUD

51.    As of February 22, 2005, Defendant LaBud had been a non-continuous employee of AMC since 1999, and thereafter had become at different times "senior lead", Vice-President of Compliance, and Senior Vice-President of Compliance of AMC. LaBud had been a full-time employee with AMC as of approximately 2003.

**ANSWER:**    Admit.

52.    On February 22, 2005, without prior notice to AMC, LaBud resigned from AMC.

**ANSWER:**    Defendants deny that Ms. LaBud gave no notice, and affirmatively state that she gave several notices of her intention to leave toward the end of 2004 and had, in fact, resigned twice before February, 2005.  Defendants admit the remaining allegations contained in Paragraph 52.

53.    LaBud was as a key individual intimately involved in the development of the compliance engine, validation engine, and validation inquiries and specifications of AMC's proprietary system, TIGRE Web-Enabled.

**ANSWER:**    Defendants admit that Ms. LaBud was involved with the planning process for "TIGRE II".  Defendants deny the remaining allegations contained in Paragraph 53.

54.    During her approximately six years with AMC, LaBud participated extensively in the management and operations of the business affairs of AMC, and on behalf of AMC has been permitted to deal with the potential client list of AMC and the TIGRE Web Enabled system as a part of her employment and other relationships with AMC, and has had access to the above-mentioned validation system and other trade secrets and confidential information belonging to AMC.

**ANSWER:**    Admit.

### ANDREA AND LABUD FORM DEFENDANT OPUS

55.    Upon information and belief, immediately after their resignations from AMC, on or about February 23, 2005, Andrea and LaBud incorporated Defendant Opus, with the intent that it would compete directly with AMC for business in residential mortgage due diligence and consulting, especially for that of AMC's established client base of loan sellers and Investment Banking institutions.

**ANSWER:**   Defendants admit that Opus was organized, not incorporated, on or about February 23, 2005.  Defendants deny the remaining allegations contained in Paragraph 55.

## DEFENDANTS VERO AND GUIDICI LICENSE
## TIGRE WEB-ENABLED TO DEFENDANT OPUS

56.     On or about February 20, 2005, despite AMC being the rightful owner of all right, title and interest in and to TIGRE Web-Enabled, U.S. Copyright Registration No. TX 6- 083- 227, Defendants Vero and Opus executed a licensing agreement for Opus' non-exclusive use of TIGRE Web-Enabled, as well as a professional services agreement pursuant to which Vero developed a software system substantially similar to, and derived from, TIGRE Web-Enabled entitled "OpusFirst."

**ANSWER:**   Deny.

57.     All Defendants subsequently acted on the licensing and professional services agreements described above, in that Opus, Andrea, and LaBud used and continue to use TIGRE Web-Enabled in the conduct of Opus' business and Guidici and Vero developed OpusFirst, which Opus, Andrea, and LaBud subsequently used and continue to use in the conduct of Opus' business.

**ANSWER:**   Deny.

58.     The acts described in ¶ ¶ 56-57 above were committed without implied or express authority, nor with AMC's express or implied permission.

**ANSWER:**   Deny.

59.     AMC did not grant any of the Defendants any right to copy, exhibit, transmit, display, or use in any way TIGRE Web-Enabled or its source code.

**ANSWER:**   Deny.

60.     AMC did not grant any of the Defendants any right to develop or use any derivative of TIGRE Web-Enabled.

**ANSWER:**     Deny.

### COUNT I
### (Copyright Infringment)

61.     AMC repeats and realleges 1-60 above as this ¶61, as though fully set forth herein.

**ANSWER:**     Paragraph 61 does not require an answer by Defendants.

62.     The Defendants willfully infringed AMC's copyright in TIGRE Web-Enabled by copying and using TIGRE Web-Enabled and its source code, without permission express or implied from AMC.

**ANSWER:**     Deny.

63.     At the time Vero and Guidici licensed TIGRE Web-Enabled to Opus, all Defendants knew that AMC was the rightful owner of all right, title and interest in and to TIGRE Web-Enabled, U.S. Copyright Registration No. TX 6-083-227, and had not granted any of the Defendants any right to make use of or employ TIGRE Web-Enabled.

**ANSWER:**     Deny.

64.     With full knowledge of AMC's rights herein, the Defendants willfully infringed and continue to infringe AMC's copyrights by copying, using, and employing TIGRE Web-Enabled and its source code. Such was done by the Defendants without the consent, approval, and/or license of AMC.

**ANSWER:**     Deny.

65.     Defendants' acts as aforesaid violate AMC's exclusive rights under § 106 of the Copyright Act of 1976, 17 U.S.C. § 106, as amended, and constitute infringement of AMC's

copyright in TIGRE Web-Enabled. Defendants' past and continuing copying and use of TIGRE Web-Enabled and its source code constitute willful and deliberate infringement of AMC's copyrights and are causing irreparable harm and damage to AMC.

## COUNT II
### (Copyright Infringment – Derivative Work)

66.     AMC repeats and realleges 1-66 as this 67, as though fully set forth herein.

   **ANSWER:**     Paragraph 66 does not require an answer from Defendants.

67.     OpusFirst is not an independently created work.

   **ANSWER:**     Deny.

68.     Guidici and Vero based OpusFirst on TIGRE Web-Enabled's source code and referred to TIGRE Web-Enabled and its source code while developing OpusFirst.

   **ANSWER:**     Deny.

69.     OpusFirst shares substantial similarity with TIGRE Web-Enabled.

   **ANSWER:**     Deny.

70.     At the time Vero and Guidici licensed TIGRE Web-Enabled to Opus, all Defendants knew that AMC was the rightful owner of all right, title and interest in and to TIGRE Web-Enabled, U.S. Copyright Registration No. TX 6-083-227, and had not granted any of the Defendants any right to create and use works derivative of TIGRE Web-Enabled.

   **ANSWER:**     Deny.

71.     The Defendants willfully infringed and continue to willfully infringe AMC's copyright in TIGRE Web-Enabled by creating and using OpusFirst, a work derivative of TIGRE Web-Enabled.

   **ANSWER:**     Deny.

72.     With full knowledge of AMC's rights herein, the Defendants willfully infringed and continue to willfully infringe AMC's copyrights by creating and using OpusFirst, a work derivative of TIGRE Web-Enabled. Such was done by the Defendants without the consent, approval, and/or license of AMC.

**ANSWER:**   Deny.

## DEFENSES AND AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Plaintiff's claims in whole or in part fail to state a claim against Defendants upon which the relief sought could be granted.

### SECOND DEFENSE

Plaintiff's claims in whole or in part are barred by the doctrine of unclean hands.

### THIRD DEFENSE

Plaintiff's claims in whole or in part are barred by Defendants' reliance on the advice of counsel.

### FOURTH DEFENSE

Plaintiff's claims in whole or in part are limited by Defendants' innocent intent.

### FIFTH DEFENSE

Plaintiff's claims in whole or in part are barred by the doctrine of waiver.

### SIXTH DEFENSE

Plaintiff's claims in whole or in part are barred by the doctrine of laches.

### SEVENTH DEFENSE

Plaintiff's claims in whole or in part are barred because Plaintiff failed to mitigate its damages.

**EIGHTH DEFENSE**

Plaintiff's claims in whole or in part are barred by the applicable statutes of limitation.

**NINTH DEFENSE**

Plaintiff possesses no protectable copyright that can form the basis of this lawsuit.

**TENTH DEFENSE**

Plaintiff's claims are in whole or in part limited because OpusFirst was not derived from

TIGRE Web-Enabled.


                                            Respectfully submitted,

                                            OPUS CAPITAL MARKETS CONSULTANTS,
                                            ET AL.

                                            By:     /s/ Joseph L. Kish
                                                    One of Their Attorneys

Joseph L. Kish (6197916)
Bartly J. Loethen (6225484)
Trisha M. Cole (6289247)
Synergy Law Group, L.L.C.
730 West Randolph, 6th Floor
Chicago, Illinois  60661
Telephone:  (312) 454-0015
Facsimile:  (312) 454-0261

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Defendants' Answer and Affirmative Defenses was served upon the attorneys listed below electronically through CM/ECF on June 5, 2008.

Thomas Jefferson Ramsdell     tramsdell@ramsdell-law.com

Bartly Joseph Loethen     bart@synergylawgroup.com,nmcdonald@synergylawgroup.com

Gregory James Chinlund     gchinlund@marshallip.com

Anthony S. Hind     ahind@ramsdell-law.com,jreno@ramsdell-law.com

Joseph L Kish     jkish@synergylawgroup.com,nmcdonald@synergylawgroup.com

Trisha M. Cole     tcole@synergylawgroup.com,nmcdonald@synergylawgroup.com


By:   /s/ Joseph L. Kish
          One of Their Attorneys


Joseph L. Kish (6197916)
Bartly J. Loethen (6225484)
Trisha M. Cole (6289247)
Synergy Law Group, L.L.C.
730 West Randolph, 6th Floor
Chicago, Illinois  60661
Telephone:  (312) 454-0015
Facsimile:  (312) 454-0261